I'm only two for two on name pronunciations today, so I'm not even going to try here. Counsel for the appellants, Mr. Gagin, you may begin when you're ready. Each side will have 15 minutes, and you'll keep your own time. Good morning. May it please the Court, my name is Andrew Gagin on behalf of plaintiff appellants Lerner & Rowe. We ask that this Court reverse the grant of summary judgment in favor of defendants, and we offer several independently sufficient reasons why this Court should do so. The most glaring error committed by the district court was its conclusion regarding the 236 documented instances of actual confusion in this case. This conclusion was a break with Ninth Circuit precedent, which said that one or two or several instances of documented actual confusion may be sufficient on their own to survive summary judgment. Isn't this situation different? Usually when I have trademark cases, somebody presents some evidence, and you don't know what the denominator is, you don't know what it comes from, but there are Yelp reviews, there are letters written, et cetera, et cetera. So you see three or four, five, 10, 20, 100, but you don't know what kind of sampling that is. Here you do seem to have a sampling, that is the call logs. I assume that's the point of entry for all people. You know, how else do you, they're not going to visit the firm, so once they see the website, they make a call, or it's going to result in some kind of conversation, right? That's correct. So it captures the universe of those who saw the ad or somehow enticed by the ad. So you've kind of got the whole universe there. And then from that, you can see what percentage or how many appear to have some degree of confusion. There's a debate whether all 236 or 238 really evidence confusion. Some may just be saying a referral. There's an argument that only a fraction of those actually show confusion. But in any event, but it's out of a universe of like 100,000 or something, right? It's like 0.25% or according to your opponent. That is not the correct universe, Your Honor. Defendants have ported over tests from the Tenth Circuit in the 1-800 Contacts case where they looked at 25 clicks versus approximately 1,000 impressions to get a very low percentage. There was only one instance of actual confusion similar to the calls in this case. The 1-800 Contacts case looked at the number of clicks versus the number of impressions. And that was one of the main reasons why they found a de minimis amount of confusion in that case. Were we to do that in this case, we would not be looking at the 236 calls recorded by Accident Law Group's Intake Department. We would be looking at the over 7,000 clicks. It's apples and oranges, first of all, regarding whether or not we should be looking at click-through rates versus the threshold of appreciable confusion in surveys. That's, again, something very different. But if we were even to do that, we're not using the right number. The 0.02% is essentially meaningless. It's not what's actually being compared. I'm not sure I understand. What are we missing if you only look at the 0.22%? What are the instances of actual confusion that are not being picked up? If we were to compare, if we were to look to the number of impressions as the denominator, which we argue is not reliable anyways because it doesn't account for individuals who viewed ads multiple times or people who viewed ads without the purpose of seeking to hire Lerner and Rowe for representation. Myself, for example, I have looked at a number of ads. So you would agree with me that the owner of the mark has to demonstrate the likely confusion, right? Yes. Okay, so that's your burden. That's your client's burden to show. And what we have here are really the numbers that Judge Chen just referenced, which are the 236 calls compared to the overall number of calls, which was something in the 110,000 range. Excuse me, Your Honor. The number of total calls was approximately 10,000. The number of impressions of the ads was approximately 109,000. Okay. So you're combining as a universe both things that you're talking about, the impressions plus the calls, correct? No. So the number of impressions is the number of times the ad was shown to somebody who entered a search for Lerner and Rowe. The ads will come up lots of times, right? The number of calls is different than the number of clicks on those ads. You can click on the ad, go to the website, and ultimately decide that you're not interested in talking to the firm that you just clicked on. That's why the number of calls is a more important and more informative number. Okay, so let's go with that. So if we're looking at the number of calls, what we have is this pretty de minimis percentage by way of percentages, right? It's something like 0.22 percent, which is a far cry from what the other cases utilize as sort of a meaningful data point for confusion. And don't our cases require an appreciable number of instances of actual confusion for that factor to tip in Lerner and Rowe's favor? Yes, and this circuit has held that even a single digit, not single digit percentage, but single digit number of confusion can tip that factor in favor of the plaintiff. And this Court has said that because of the difficulty of proving confusion in these types of cases, even a few instances, one or two or several instances, can weigh strongly enough in plaintiff's favor to survive summary judgment. That's usually when you don't really know the true numerator and the true denominator when you're looking at percentage, what portion is actually being confused. Because you're getting a rough sampling. You're not getting a full sampling of everybody. Some pop out of the woodwork. And so that's a pretty good indicator something's going on out there. And that's one of the eight factors. So I could see that. But when you have this unusual case where we do have, where there's the calls maybe right, you just look at the calls that came in, that is the point of entry. Did you say 7,000 or 9,000? There were approximately 7,400 clicks on the 109,000 ads. That is a click-through rate of just under 7%. All right. So those are, that's the portal by which there could be some confusion, right? I mean, if people didn't even click, I mean, don't worry about it. I mean, it's... Maybe. We don't know if someone didn't click because they were confused.  We don't know anything about that other 100,000. Well, but it didn't result in a transaction having occurred because of a confusion. They're thinking they're hiring one versus the other. So that is a fair... So we do have this unusual situation just based on the way the nature of this case is. We do have a universe. We may dispute which is the proper universe, but we do have a universe. And we have a proportion that we can actually see through the call log. So this is not like looking for the tip of the iceberg. We have the whole iceberg here we can assess. So that's why this case seems different than the usual. We get a handful of complaints. People write letters. People write Yelp reviews where people are confused or on Amazon, you know, where some response people don't hear. You have everyone, it seems to me, or virtually everyone. I would say a fair approximation of the universe, yes. So it's as if it were a survey. If you had a survey that was done, let's say the expert hired by the court did a survey, and they came out with a percentage of whether it's 2% or 0.2%, would that meet the appreciable number or significant portion test of trademark infringement? Courts have pretty uniformly stuck to a 10% threshold of appreciable confusion in surveys, but that is not the test for real-world confusion. No courts have adopted that threshold specifically as we need to have 10% of all callers or anything. That would be completely novel. And the reason why is that these types of advertisements are not meant to have 80%, 90% click-through rates. They are universally across all industries very low, single-digit click-through rates across any industry. And in the legal industry, as our expert put in his report, the average during the relevant period was between 1.5% and 3.5% clicks total. And that's not just limited to Lerner and Rowe or Accident Law Group or anybody. That's 1.5% to 3.5% across the industry. And here we have two to five times that rate of click-through because of these ads and their nature and, as we argued in our brief, how they use generic language. They have a descriptive name. Counsel, let me interrupt you here. I believe you provided or your client provided a summary sheet with what appears to be every instance consumers mistakenly called ALG. There's an assertion that there's 236 instances of confusion, but we noted that in that summary sheet there was only 186 instances. Which one do we credit? Does it matter? That was a summary sheet prepared by defendants. I apologize. And they left off some. That was later corrected. 236 is the correct number. What about when you look at the context and the degree of sophistication of the consumer here, which is, of course, one of the factors, not only do you have people looking for a personal injury lawyer and not only do you have people searching the Internet, which our court has recognized has some special qualities, but these are folks who actually, as I understand it, have a search engine named Lerner and Rowe. And there's an argument that cuts both ways, because they're looking for Lerner and Rowe and they may be more susceptible to being deceived when they see the listings pop up. On the other hand, they already have in mind what they're looking for. They're not just looking for any personal injury attorney. They're looking for something specific. And so as they go through this list, one could argue that they're even sort of even more sophisticated than just somebody who's looking for a personal injury lawyer on the Internet. They've already been equipped knowing that this is a firm they want to look at or do some research on. And wouldn't that make it tougher for them to be fooled, especially given the display every time your competitor list, their listing appears, it says ad there and it has the URL, et cetera, et cetera. Wouldn't somebody looking for Lerner and Rowe be able to discern and look further down to find Lerner and Rowe and kind of get through the haze there? Sometimes, perhaps. As we pointed out in our brief, there are a number of reasons why that wouldn't happen. For starters, Lerner and Rowe also advertises on its own name, so the Lerner and Rowe ads may also come up in the first position, which our SEO experts testified in our 30B6 deposition that that is the prime real estate for searchers. When they do a search for something specific, they expect that the most germane results are closest to the top. Google has become the dominant market leader in search, not because they provide the most options, but because their algorithm is designed to put the most relevant, most germane options front and center for the searchers. They rely on that relevance for why they choose Google versus Bing or something else. So a competitor getting into that first position is valuable in and of itself. And then as for the ads themselves, the context of the ads themselves, not only is it the generic or descriptive name accident law group as opposed to something more distinctive like Lerner and Rowe or Joe Brown law or something like that, that contributes to the ease of confusion that consumers may fall into when they click on something, especially when that URL you mentioned is first of all not an active link. It is the smallest font in the ad. The bright blue large text is often, you know, that is what draws the eye itself. And in many cases, the advertisements used by accident law group is a click-to-call ad. It is just a phone number. It doesn't say this is accident law group. It doesn't say this is Joe Brown law. It's just I searched for Lerner and Rowe. The first thing that came up was a phone number. I click on that phone number, and now I'm at a different law firm than what I intended. Is it not denominated ad? It does have a small logo up in the corner. During the relevant period, Google puts not just ad up in that exact location, but for the organic results as well, something called a favicon, which can be like a little logo that, you know, each result has something up in that corner. So why isn't this case just like the multi-time machine case? I mean, the facts are slightly different, but the point is that the URL name is available. The person searching can look to see it's an ad, or they can see there are different pieces of information that they can determine that this is not the thing that they were searching for. The chief difference between this case and the multi-time case is that in multi-time, there were no evidence of confusion, no examples of consumers who expressed confusion. The plaintiff during oral arguments even conceded that there was no evidence of confusion in that case. So because that factor was already dispensed with, the court looked to, again, a different scenario, assessing how Amazon displayed its results versus how a competitor targets another competitor and takes advantage of the goodwill associated with their brand by what's called conquesting in Google ad parlance. And in the multi-time case, the court listed numerous factors as to why those ads were so clearly labeled that no reasonable searcher could be confused, and none of those factors cited in that case are present in this case. So the court can... Why isn't the presence of the URL a factor or the sort of notation that it's an advertisement? Why can't we consider that to be some of the factors that were considered, like the brand name or the model number in the multi-time case? It could be considered, but it also comes back to how it was displayed in the Amazon results versus the Google ad results. Google has taken steps over the past decade to make their ads look more uniform with the organic results, specifically to get people to click on the ads more often instead of clicking on the organic results, because they make money off of clicks. And I think all of us have noticed that over the years. It used to be on the side banner and stuff, and we could ignore it. Now you've got to scroll down like five rolls of the scroll to get to what you want. But it seems like most people know that now, and that's just part of the sophistication of the Internet user. You know whether you're on Google or looking for a restaurant on Yelp or whatever, you've got to get through the sponsored ads, the ad ads, and all sorts of stuff before you get to the organic ads. I think that's a – isn't that a fact of life that people using the Internet, especially if you're looking for a specific law firm for personal injury, the reasonable user would know that. The first thing that pops up is not necessarily it. I think it's a reasonable conclusion in many circumstances. I would also point out that Google continues to change the layout of their display page. So it is constantly changing. You need to constantly update your priors on that. But then also it does not explain how so many people called one firm and asked for another firm and said explicitly, I thought you, Accident Law Group, were Lerner and Rowe. I'm calling for Lerner and Rowe. I wanted Lerner and Rowe. These people were confused, and it's impossible to ignore that. And there's some confusion, but I guess the ultimate test is appreciable number, significant portion. And I don't know, how do you define that? At what point do you find that that threshold has been crossed? It is a question of fact for possibly the jury to weigh. In my opinion, that factor should be essentially a binary test. Is there evidence of confusion or is there not? And then if there is, a follow-on question of is it so de minimis? Do you have any authority that you can cite for the idea that this should be a binary test if there is evidence and it should go to a jury? And if that's the only way you can get summary judgment if there's absolutely no evidence of confusion? No. That's my interpretation of cases like network automation, like Reardon, like JL Beverage, like Ironhawk and Stone Creek and California Darts and Rosetta Stone. All of these cases look as a preliminary matter as to whether or not there is confusion. And in many cases, if there is no confusion, they move on. They determine whether or not there's confusion by weighing the data, the percentages of whether there's an appreciable number of actually confused consumers. I'm sorry, could you repeat that? Yeah. So your point is that there should be a binary test. If there's any evidence of confusion, even one call, it should go to a jury. But that, I think, flies in the face of the holdings of some of those cases that you rattled off where really they're looking at whether there's an appreciable number. And that is correct. I apologize if I misspoke. I think it should be essentially a two-part test for that factor is, is there confusion or is there not? And if there is, look at the context. And if it is so clearly de minimis, if it is just isolated cases, one call, one complaint, a handful, something like that, then I believe it is reasonable for a court to conclude that that is de minimis, especially in the context of a larger possible universe of confusion. But if it is not so clear, then it should go to the jury to see whether or not they agree that this is an appreciable amount of confusion. I think if it's even a close call at all, given what courts have acknowledged about the difficulty in procuring this type of evidence, this should be a fact question that should go to the jury. Okay. You're out of time, and you didn't indicate that you wanted any rebuttal time, but we'll put two minutes on the clock for you for rebuttal. Thank you, Your Honor. May it please the Court. No reasonable jury could find that 0.2% is an appreciable amount of actual confusion. Your Honors, this is a keyword advertising case. It is different than a traditional trademark infringement case. In traditional trademark infringement cases, there's two competitors using two different trademarks that may or may not be confusingly similar. Here, we have only one trademark, Lerner and Rowe, and the question is whether or not accident law group bidding on that keyword or paying for that keyword has caused confusion or is likely to cause confusion. It's a — unlike traditional cases, which are very fact-intensive, the sleek craft factors are not well suited for keyword advertising cases. And as Judge Chin pointed out, unlike traditional cases, in this case, we actually know the universe of people who were exposed to the ad. The leading treatise on trademark law observed that courts almost always find no likelihood of confusion if all the defendant has done is use another's mark as a keyword to trigger an ad for the defendant in which the other's trademark does not appear. Here, accident law group's ads did not display the Lerner and Rowe trademark, were clearly labeled in bold as ads, were partitioned from the other search results, and clearly included accident law group's name. So, counsel, then how do you respond to the 236 instances of confusion? I understand that you say it's point whatever that percentage is, so it's irrelevant and doesn't matter. But, I mean, there's evidence that there is confusion. Yes. And evidence of confusion at 0.2 percent of the universe is actually evidence of no likelihood of confusion. Because, as we know, from the case law, confusion has to be probable or likely and not just possible. But we also know in our court, the Ninth Circuit here, the Ironhawk case, the court there said that, nevertheless, de minimis evidence is still, and I quote, evidence a reasonable jury could rely on to support a finding of actual confusion or when assessing a likelihood of confusion under the totality of the circumstances. Yes. But Ironhawk was a traditional trademark infringement case. It was not a keyword case, Your Honor, where the factors are different. So in network automation and in multi-time machine, this court said we're not looking at all of the sleek craft factors. We're looking very specifically at just a couple of factors that are relevant in a keyword advertising context. Okay. What about the entrepreneur media case? That is a case that says one proven instance of confusion among the clients is sufficient. Yes. Again, not a keyword advertising case. In entrepreneur media, there was no, we had no idea what the universe was of exposure to the confusingly or arguably confusingly similar trademark. Here, what we know is we know that 108,000 people, 109,000 people were served up this ad, these ads. 109,000 people typed in Lerner and Rowe and saw as an ad accident law group. Now, many of those were actually not the result of anything accident law group did, but I'll come back to that. But some of them were the result of accident law group paying for Lerner and Rowe as a keyword. Out of the 109 people who saw it, we have 265 at best who mentioned, even mentioned Lerner and Rowe in a telephone call to accident law group. And if we look at the case, the 1-800 contacts versus Lensco case, which is a 10th circuit case, but it is squarely on all fours with this case, the outer limit of possible confusion, as Judge Chen pointed out, is going to be the click-through rate. And in our case, the click-through rate was 6.82 percent. Now, Mr. Gagin asserted that the normal click-through rate would be something like 1 percent, but that is contrary to the record in this case. The record in this case at ER 330 shows that when my client was bidding on non-brand keywords, their click rate was 5.45 percent. So when they were bidding on Lerner and Rowe keywords, it was 6.82 percent. That's only a difference of 1.5 percent. So it is the outer limit, according to 1-800 contacts, is the worst-case scenario. And that outer limit in this case is well below 10 percent, which many courts have recognized as not an appreciable number. No reasonable jury could determine that there's a likelihood of confusion where only .2 percent of the people who saw the ads called and only 6.8 percent of the people who saw the ads even clicked on it. Is appreciable number, the term that is used, is that an absolute number or a percentage? I think it has to be a percentage, Your Honor. If you don't know the universe, it's difficult to determine what an appreciable number is, which is why I think we see some of these outlier cases that say just a couple of instances would at least weigh in favor, in a traditional sense under the sleek craft factors, would at least weigh in favor. But here, again, where it's a keyword advertising case and we know the universe, I think it absolutely is not an absolute number. It is a percentage. It has to be a percentage. We know the denominator, we know the numerator, we know exactly how many people were exposed. And what's your strongest authority on the percentage approach as opposed to an absolute number? I think the best argument or the best case law for that would be the 1-800 contacts case in the Tenth Circuit. But that's for a click-through rate. There are many, many cases that have talked about needing an appreciable number. And there's a fun case in the District of Delaware that talked about the numerator and the denominator. And they said, we know the numerator, but what's the denominator? But here in this circuit, every case that has looked at it, including sleek craft itself, has said that it has to be an appreciable number, and that's a point that we've been spending a lot of time on this actual confusion, and I think it's an important question. But this is one of many factors that we're considering. And on the degree of consumer care factor, I want to talk for a moment about the argument that Lerner and Rose made, that is, here there have been no costs. The consumers are not expending any amount of money at all, because these are contingency fee cases, and so the people who are looking for somebody to represent them are not really — we can sort of plug them into the various cases that talk about the sophistication of the consumer and say they're really not all that sophisticated. And I think you make the argument that generally the value of the services is really what we ought to be looking at and not the out-of-pocket costs. What's your best authority to support that position when these cases really do traditionally talk about out-of-pocket costs? Your Honor, I don't know of any case law that has talked about the degree of care in that context, but as you pointed out, I can think of no greater degree of care than choosing a lawyer, than choosing the person that you're going to have a fiduciary relationship with. In multi-time machine, they were looking at the value of a watch. It was like $200. I just think it's just a matter of common knowledge that you don't want to enter into an attorney-client relationship with somebody you don't trust, and that you're going to use a lot of care. Counsel, let me push back on that a little bit, though, because — and I can understand that. Work that they do, contingency. Someone's just been in a car accident. Someone maybe, you know, can't go back to work because of said car accident. So they're looking for someone possibly to represent them quickly and start getting them, you know, benefits and getting them, you know, getting this case filed right away. I don't know that I agree with you that they would necessarily be able to take the same care. Maybe they would want to, but, you know, other pressures are pushing them to hurry up and get a lawyer because they feel like, oh, my goodness, if I don't, I'm going to lose my rights, or the insurance company keeps calling me and I don't know what to do. Yeah. I think there's two things, Your Honor. One is I would say in addition to the fact that they're choosing a lawyer, they're also using the Internet and they are searching the Internet. And I do have support for that, and that's a network automation case, which is that reasonable, prudent and experienced Internet customers are accustomed to exploration by trial and error. They skip from site to site, ready to hit the back button whenever they're not satisfied. So network automation observed that the default degree of the consumer is becoming more heightened as the novelty of the Internet wears off. What was network automation about? Network automation was very much like our case. It was indeed a case where ActiveBatch had used, where the competitor had used ActiveBatch as a key term, which was the network automation trademark. It was just like our case. But what were people searching for? Oh, they were searching for software that did something similar to, I believe, what Salesforce does. It was sort of an enterprise software to be used in the company. So, factually, I don't see it. I mean, I get it, but I'm saying these are not the same consumers. You're not looking at the same, I'm talking about people who have just been in a car accident and they can't get to work and they need to move this case forward so they can feed their families. That, to me, is different. Understood, Your Honor. So if we look at ER-568, which is the actual ads in question, that consumer who's distressed, who's looking for a lawyer quickly, they type in Lerner and Rowe, and what they see, and this is one of the few screenshots that was actually, is actually relevant. I want to talk about that in a minute. But what they see is they see accident law group and then right below it they see Lerner and Rowe. If we look at ER-566 or 569, actually 569 is even better, we see Lerner and Rowe first and then we see accident law group. So in that, no matter how distressed they are, in that split second of time, they have choices. They've run their search and they see what they're exactly looking for. They were looking for Lerner and Rowe. They typed in Lerner and Rowe. They see Lerner and Rowe and they see accident law group. And some of them decided, oh, let's see what else is out there. That is free competition. That is free market. That is why keyword advertising cases are different, Your Honor. Which way does it cut given the fact that these are consumers who already typed in Lerner and Rowe, looking for Lerner and Rowe, when they see 568 and 569? Yes, I think it absolutely, Your Honor, obviously I think it cuts in our favor because they know what they're looking for. And they also know anyone who uses Google knows that you're going to get choices. So they know they're looking for Lerner and Rowe. They know they have choices. Maybe they're calling more than one. And this is the problem with the call log. And we didn't talk about this yet, Your Honor. But I believe that the evidence of the caller's statements in the call log is inadmissible hearsay. And I do believe that the district court committed reversible error on this point by letting those calls in as evidence of actual confusion. Because we really don't know, and it's not trustworthy for what they were, you know, what they were actually thinking. Well, the first level of hearsay is answered by the business records rule. That's absolutely right, Your Honor. I agree. The second level, isn't that answered, if not by the residuary hearsay rule, by indication of state of mind of the caller? Well, Judge Campbell determined that it was answered by Rule 807A, which is the indeed the residual rule. But in order to satisfy for the residual rule, it has to have sufficient guarantees of trustworthiness. And it has to be more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts. Lerner and Rowe did not take a single deposition or offer a single declaration in this case. This was not the most probative on the point evidence. Indeed, it was just the opposite. Well, can we find as a reviewing court that it's admissible under 803 as evidence of state of mind of the declarant? I don't believe so, Your Honor. I don't believe that the declarant's state of mind is in any way conveyed by the call log. Why not? Is that what we're talking about? People are confused? I think it's important to remember the purpose of the call log. The purpose of the call log was for Accident Law Group to figure out where they wanted to spend their marketing dollars, right? So all their intake people were instructed to do is figure out did this come from the Internet, did it come from TV, billboards? Where did it come from? They were not tasked with determining was that caller confused. So therefore, it's untrustworthy in determining whether that caller was confused. If that person was tasked with determining the state of mind of the caller, I would agree with you. That was not the purpose of the call log. It was simply to determine where do we want to spend our marketing dollars. So I don't believe that these are even admissible. But if they are admissible, they are all over the board as to what the callers actually said. And very few of them actually said that they were looking for Lerner and Rowe. Obviously, Mr. Gagin focuses on those. Some of them literally said they were referred by Lerner and Rowe. And so in that context, I think it's important to go back to your question, Judge D'Alba, that that consumer knows what they're looking for, they're getting choices, and they're choosing to check out more than one law firm. That's free competition. That's exactly what should be happening here. And not determining — Alternatively, if we don't agree with your arguments that we've just heard, that we can affirm on the grounds that ALG never used the mark in commerce. But isn't this panel bound by network automations holding that purchasing AdWords are a use in commerce? Well, I believe that the district court was bound by it, but I believe this panel can overturn its own prior precedent. And in that section of the brief, that is what we're asking you to do. At the time that network automation was decided, it was a different world. It was a different Internet. And today, we know that users are sophisticated and, you know, keyword advertising is well-respected. Indeed, as you will see from the record, Lerner and Rowe used keyword advertising — actually bid on the brands of other law firms. They did exactly what they vilified us for doing in their brief. Is there any intervening law since network automation that would give us the ability that sort of changes the course? We'd be the first — you're asking this panel the first instance to reverse our court's precedent, which — so let me ask you this. If this court were to decide to take up this issue on Bonk, to reconsider its ruling there, why doesn't ALG's purchase of the Lerner and Rowe keywords meet the Lanham Act's definition of use in commerce? It doesn't because the way keyword advertising works is that Accident Law Group didn't have to do anything with the Lerner and Rowe name. They simply — Google said to them, are you interested in keywords? Here's a suggested list. They said, okay, we'll bid on those, and then that's what they did. And I think it's — and so they didn't display it, they didn't speak it, they didn't use it in any way. And I think it's very important to talk about the causation problem. There is a disconnect between anything Accident Law Group did and the display of these ads. What we know from the record is that under broad match — broad word matching, Google was serving up the Accident Law Group ads to consumers who typed in Lerner and Rowe, whether or not Accident Law Group was paying them to do so, because they considered it to be a broad match with, for instance, accident lawyer or auto lawyer. And if you look in the report of Peter Kent, you can see that it didn't really matter whether Accident Law Group was even paying for it, which is one of the reasons why in today's day and age it's absurd for us to follow a rule that Accident Law Group somehow used the mark. Nothing Accident Law Group did actually led to these ads popping up. They were paying — they paid for — I mean, other than paying for ads in general, of course. But whether or not they paid for Lerner and Rowe, these ads would pop up under a broad match. And I think that's an important reason to consider this not a use of the trademark. But you're essentially saying some ads like 568, 569 would have popped up anyway had these words not been purchased, and therefore to the extent there is some confusion, some of that confusion is due to broad word match and not necessarily to the use of the mark here in the search term? Absolutely, Your Honor. And in fact, 566, 568 and 569 are the only ones — the only ads that even — that are in the record that were even during the timeframe when Accident Law Group was paying for Lerner and Rowe as a keyword. Every other ad that you see in the record was post-May of 2021. And that's when Accident Law Group stopped paying. So long after they stopped paying, it continued — Google continued to serve up the ads. Now, Mr. Gagin will tell you that it had something he's going to surmise, that it had something to do with the fact that they in the past had paid for these ads. But that's not what the experts say. What the experts say is it's a result of broad word matching and that it just happens automatically. I believe I am out of time. You are. Thank you very much for your argument. Mr. Gagin, we'll give you two minutes for your rebuttal. I will just address that last point briefly first. The broad match algorithm can serve ads even if a competitor is not paying for them. But it is simply not true that Accident Law Group did nothing to have their ads served more frequently and in higher position to people who searched for Lerner and Rowe versus whenever the Google broad match would decide to serve it based on the connection that Google's algorithm draws on the relatedness of these two things, which can be contributed to by people searching for Lerner and Rowe, Accident Law Group purchasing ads for Lerner and Rowe, and people clicking on those ads. That is something that the algorithm can pick up and draw an association therein. So it had an incremental effect. Yes. There is nothing in the record as to what specifically that, like quantifiably what that incremental effect was. But both experts and then our 30B6 deposition as well all testified that that can be a factor that contributes to the algorithm. Okay. But looking again, keep going back to the actual confusion evidence, it's fair to assume that some of that may have been due to the broad word match issue versus the purchase of the keyword issue. We just don't know the proportion. After they were no longer buying, I would agree, yes. Thanks. As to a couple of the quick points, the Adler case in the Fifth Circuit in 2021 addressed the issue of whether or not the use of the trademark in a keyword ad had to be visible, and they declined to adopt a standard that it had to be visible. So another circuit court did very recently address a similar factual pattern and declined to grant the approach that defendants are asking for regarding use and commerce. Are there any other questions from the court at this point? No. Thank you very much. Thank you, Your Honor. Appreciate counsel's arguments. And I think that concludes our cases for today, so we will stand in recess. Thank you.
judges: DESAI, ALBA, Chen